**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Raymond James Schnabel; et al., | ) | No. CV 07-150-PCT-JAT |
| Plaintiffs, | ) | **ORDER** |
| vs. | ) | |
| Hualapai Valley First District; et al., | ) | |
| Defendants. | ) | |

Currently pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. #64) and Defendants' Motion for Summary Judgment (Doc. #66). The Court now rules on the motions.

**I.    BACKGROUND**

Ordinarily, when considering a motion for summary judgment, the Court views the disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). Because both parties have moved for summary, the Court will attempt to provide a neutral recitation of the facts and provide both versions of disputed facts when pertinent.

This case stems from the terminations of the six Plaintiffs, all of whom used to work as firefighters for Defendant Hualapai Valley Fire District ("HVFD"). Plaintiffs claim that Defendants fired them in retaliation for exercising their First Amendment rights to free

speech and association.  All six of the Plaintiffs belonged to United Professional Firefighters of Kingman, International Association of Fire Fighters ("IAFF") Local 4191 (hereinafter the "Union") when Chief Eder terminated them.

Both sides agree that at the time of the terminations, morale was low at the HVFD. The low morale stemmed, at least in part, from certain firefighters' unhappiness with Defendant Chief Wayne Eder.  Defendants had identified Plaintiffs as belonging to the group of firefighters dissatisfied with Chief Eder and the environment at the HVFD.

In late August 2006, Plaintiffs Jim Schnabel and Kamrin Dooley began compiling, in email form, a list of concerns raised by departmental employees regarding the HVFD and its leadership. (Plaintiffs' Statement of Material Facts "PSOF," Doc. #57, ¶2).  Plaintiffs argue that those concerns addressed issues of public safety, firefighter safety, departmental mismanagement, staffing, pay, potential illegal conduct, and misuse of departmental and HVFD funds. (Plaintiffs' Statement of Material Facts "PSOF", Doc. #57, ¶2).  Defendants argue that the list of concerns includes a number of mostly personal, rather than public, matters. (Defendants' Separate Statement in Opposition to Plaintiffs' Statement of Material Facts "DCSOF," Doc. #73, ¶2).  The list of concerns reads as follows (all mistakes and emphases in the original):

> 1.) min. staffing (Multiple MEMOS - Aug 27, 2006, Aug 15, 2006, Jan 4, 2006)
>
> 2.) Sparky still being a secretary. since April 25 - only supposed to be fore 60 days-max — Continues to make his wages doing a administrative assistants job (MEMO April 25, 2006)
>
> 3.) Carol Wilson – how long was she on the payroll after her administrative leave???
>
> 3.) Approx $9000.00 on new Command 1 from Sun Valley Bumper - Tax payers know this?
>
> 4.) Spending time and man power on other agencies while HVFD falls apart
>
> 5.) Perception of – this is WLE's department and not HVFD as a whole/brotherhood
>
> 6.) Non-HVFD personnel driving a command vehicle - (Chief's wife)

7.) Verbal abuse of all personal

8.) Physical abuse of R. McSHea, K. Dooley - maybe others?

9.) Medics???????

10.) Untrained people in positions they are not certified for — etc. (MEMO)

11.) Board not being informed of the lack of man power etc.

12.) Volunteering at Truxton will earn extra points for next evaluation - - - SOP?? (MEMO June 21, 2006)

13.) Aug 30, - - - still not Administrative assistant

14.) Trading landscaping duties for department favors using department personal and eq. (example - board member P. Lewis, C. Schrum, Neilson residence)

15.) CONSISTANTLY INCONSISTANT!!!!!!!!!!!!

16.) Employee manual stating that the fire chief is exempt from everything

17.) Why is the entire department on probation - - - CONTROL

18.) Ladder Truck??? New one??? Old one - - - Still not fixed/inservice as of Aug 30, 2006 - - - ISO???

19.) Salaries still low, but Chief gets $17,000 raise?????

20.) Chief using HVFD vehicle to pick up parts in CA, then using vehicle for personal family business - - - miles?, gas?, wear and tear? Wrecked on way to CA

21.) Chief background check - - - Assualt charge in CA???

(Ex. 1 to Doc. #57).

Schnabel and Dooley circulated the list of concerns to other departmental employees to solicit additions.  Captain Jason Scott (a Battalion Chief at HVFD at the time suit was filed) received the list via email and printed off a copy for Chief Eder.  (Doc. #57, ¶3).  Scott believed that all six of the Plaintiffs were involved in the preparation of the list.  (Doc. #57, ¶3).

On August 31, 2006, after receiving a copy of the list, Chief Eder scheduled a mandatory meeting for all departmental personnel for September 5, 2006.  (Doc. #57, ¶5).  At the September 5 meeting, Chief Eder addressed the list of concerns and stated why he felt

- 3 -

1  the concerns were misplaced. (Doc. #57, ¶6). Both Schnabel and Dooley attempted to speak

2  at the meeting, but Chief Eder ignored them. (Doc. #57, ¶6).

3  **Plaintiffs Dooley and Schnabel**

4  Seven days after the meeting, on September 12, 2006, Chief Eder terminated Dooley

5  without prior notice. (Doc. #57, ¶8). Plaintiff Dooley's termination papers indicated he was

6  fired for failure to successfully complete his promotional probation. (Doc. #57, ¶8). The

7  papers did not give any more details regarding the reasons for his termination. (Doc. #57,

8  ¶8). Because Dooley was on promotional probation, he could be discharged without cause

9  and without a right of appeal. (Doc. #73, ¶10).

10  On September 15, 2006, Chief Eder terminated Plaintiff Schnabel. (Doc. #57, ¶9).

11  Schnabel's termination papers stated that he also was being discharged for failure to

12  successfully complete his promotional probation. (Doc. #57, ¶9). When he inquired further

13  into the grounds for his discharge, Chief Eder told Mr. Schnabel that he was being terminated

14  "because of what's happened," and because "too much s--- has gone down." (Doc. #57, ¶9).

15  **Plaintiff Nyberg**

16  Plaintiffs assert that in late August of 2006, Plaintiff Nyberg discussed with Captain

17  Scott the possibility of having a departmental meeting to address the list of concerns. (Doc.

18  #57, ¶4). Nyberg alleges that in response, Scott told him that any attempt to organize such

19  a meeting would only lead to Schnabel's termination and the termination of anyone who

20  spoke up at such a meeting. (Doc. #57, ¶4). Scott denies that he ever told Nyberg that

21  anyone speaking up would be terminated. (Doc. #73, ¶4).

22  On November 5, 2006, the President of the Union advised the Union members of

23  upcoming news articles and radio interviews involving the Union, Kingman School District,

24  and HVFD. (Doc. #57, ¶13). According to Nyberg, Scott confronted him on that same day

25  and repeatedly asked what had been said at a recent Union meeting. (Doc. #57, ¶14). Scott

26  admitted asking Nyberg about the meeting, but denied telling him that all members of the

27  Union would be called in and terminated. (Doc. #73, ¶14). Nyberg alleges that on the next

28  day Scott confronted him with a personnel action form indicating that Nyberg would be

1   terminated if he did not explain what took place at the union meeting. (Doc. #57, ¶15). After

2   Nyberg denied knowing anything about the meeting, Scott shredded the termination papers.

3   (Doc. #57, ¶15).  Scott did not deny that this confrontation took place, but denied that he

4   acted on Chief Eder's behalf.  (Doc. #73, ¶15).

5        On November 8, 2006, an articled entitled "Union Officers say Fire Chief 'Hosed'

6   District.  Allege Wayne Eder Abused Position" appeared in the local newspaper. (Doc. #57,

7   ¶20).  As a result of this article, HVFD Board Members Schrum and Lewis investigated the

8   accusations made against Chief Eder.  (Doc. #57, ¶21; Doc. #73, ¶21).  In the course of this

9   investigation, Defendants Schrum and Lewis "interrogated," according to Plaintiffs, or

10  "interviewed," according to Defendants, Plaintiffs Nyberg, Carlson, Campbell, and Lopez

11  at some point in late 2006.  (Doc. #57, ¶21; Doc. #73, ¶21).

12       In the interview/interrogation of Plaintiff Nyberg, Defendants Schrum and Lewis

13  discussed high turnover at HVFD, firefighters being on constant probation, and the incident

14  with Captain Scott. (Doc. #57, ¶25).  They also asked him if Union members Mike Stapleton

15  or Ed Eads had given any information to the Union.  (Doc. #57, ¶25).

16       Chief Eder terminated Nyberg on January 6, 2007. (Doc. #57, ¶33).  The termination

17  papers provided that Nyberg was being discharged for failure to successfully complete his

18  probation. (Doc. #57, ¶33).  When Nyberg asked for more information, Chief Eder stated

19  that he did not have to provide any reason for the termination.  (Doc. #57, ¶33).

20  **Plaintiff Carlson**

21       During the interview/interrogation of Plaintiff Carlson, the discussion involved

22  staffing and manning issues.  (Doc. #57, ¶24).  Defendants Lewis and Schrum assured

23  Carlson that he had nothing to worry about.  Defendants' notes from the interview contained

24  the following statement, "Mike will always be a follower.  His words came straight from

25  [Union President] Robert Borker's mouth." (Doc. #57, ¶24).  Defendants do not dispute any

26  of those allegations.  (Doc. #73).

27       Chief Eder fired Plaintiff Carlson on January 7, 2007.  (Defendants' Separate

28  Statement of Facts "DSOF," Doc. #67, ¶204).  Again, the termination papers indicated that

Carlson had failed to successfully complete his probation. (Doc. #57, ¶35). During his deposition, Chief Eder stated that he had overheard a conversation between Plaintiffs Nyberg and Carlson regarding union membership in early December 2006. (Doc. #57, ¶36). Chief Eder testified, "at that point I started thinking, I'm going, Wait a minute. If [Nyberg] is at this point, and [Carlson] was associated with this, if they're being aggressive to the point on union membership to other employees, then we have a problem. And I think at that day I pretty much made up my mind that both of those boys were gonna be terminated on their probation." Ex. 56 to Doc. #57, p. 55. Chief Eder explained this comment by stating that after the Union had called for his termination, Nyberg and Carlson had harassed another firefighter about Union issues. (Doc. #73, ¶36).

### **Plaintiff Campbell**

On September 15, 2006, the same day Schnabel was fired, Plaintiff Campbell received a verbal reprimand. (Doc. #57, ¶11). The reprimand did not concern a specific allegation. Rather, it was a more global warning – "Based on the events that have transpired within the last 30 days concerning rumors and gossip within the organization, you are reminded that any action which causes discord or disharmony within this organization will not be tolerated . . . You are reminded that issues concerning this organization that you are privy to and are not public record are not to be discussed with outside organizations, fire departments, or the general public." Ex. 13 to Doc. #57. Chief Eder indicated that if Plaintiff Campbell did not sign the reprimand form, he would terminate Campbell. (Doc. #57, ¶12).

Defendants Schrum and Lewis also interviewed/interrogated Plaintiff Campbell in late 2006. That discussion addressed Chief Eder's management style and abusive language, proper manning and staffing levels, high turnover, poor Departmental operational communications, automatic aid agreements with other Fire Departments, and the actual list of concerns prepared by Plaintiffs Dooley and Schnabel and others. (Doc. #57, ¶22). Defendants do not dispute that Campbell discussed those topics.

Plaintiffs allege that during the interview Schrum and Lewis accused Campbell of lying and stated that the Union did not exist and that it was a waste of money to join. (Doc.

1   #57, ¶22).  Plaintiffs further allege that Schrum and Lewis suggested that the investigation

2   was really targeting firefighters and specifically asked about Plaintiff Nyberg.  (Doc. #57,

3   ¶22).  Defendants allege that Schrum accused Campbell of lying after Campbell stated that

4   the Union had a contract with the HVFD.  (Doc. #73, ¶22).  Defendants further allege that

5   Lewis specifically told Campbell that the investigation was not to discuss the Union, but was

6   targeted towards Chief Eder.  (Doc. #73, ¶22).

7          Chief Eder informed Plaintiff Campbell on January 4, 2007, that if Campbell did not

8   resign from the HVFD, Eder would fire him.  (Doc. #57, ¶42). Chief Eder offered Campbell

9   a severance package if he agreed to resign and sign a waiver of liability releasing the HVFD,

10  as well as its officers, directors, employees, and agents from any liability relating to any

11  violations of law.  (Doc. #57, ¶43).

12         The paperwork provided to Campbell regarding his termination identified three

13  complaints against him; alleging that Campbell had harassed two fire firefighters on three

14  separate occasions.  (Doc. #57, ¶42).  Complaints regarding the incidents were filed in

15  August of 2006, November of 2006, and December of 2006.  (Doc. #57, ¶42).

16         One of the incidents involved firefighter Noah Glaza's verbal complaints to Captain

17  Scott in early November of 2006.  (Doc. #57, ¶¶37& 39).  According to Defendants, Glaza

18  advised Scott of a serious safety violation – the issuance of a turnout coat with a tear in it by

19  Plaintiff Lopez and Campbell's subsequent failure to procure a different turnout coat – and

20  told Scott he was ready to quit the HVFD.  (Doc. #73, ¶37).  In mid- to late November 2006,

21  Chief Eder instructed Glaza to prepare a complaint regarding the incident.  (Doc. ##57 & 73,

22  ¶38).  After receiving the first draft, Chief Eder instructed Glaza that he need to do a more

23  formal complaint.  (Doc. #57, ¶38).

24         Glaza resubmitted the complaint on December 4, 2006.  (Doc. #57, ¶38).  The

25  complaint raised the "turnout coat tear" issue and a general "harassment" complaint.  (Doc.

26  #57, ¶39).  Glaza complained that Campbell consistently treated him unfairly.  (Doc. #73,

27  ¶39).  Glaza later retracted his complaints about unfair treatment.  (Doc. #57, ¶39).

28         The two other incidents involved alleged complaints of harassment by firefighters

1   Mike Love and Miguel Buelna against Plaintiff Campbell.  (Doc. ##s57& 73, ¶45).  Both

2   Love and Buelna later said that they had never complained about Campbell to Eder.  (Doc.

3   #57, ¶45).

4         Campbell informed Chief Eder on January 10, 2007, that he would not voluntarily

5   resign.  (Doc. #57, ¶44).  Chief Eder refused to speak to him further and terminated him on

6   January 11, 2007.  (Doc. #57, ¶44).  Campbell's termination papers stated that he had failed

7   to rebut the charges previously outlined, even though Chief Eder refused to speak with him

8   on January 10 and refused to provide him with documentation regarding the allegations

9   against him.  (Doc. #57, ¶44).

10        Campbell appealed his termination to the Personnel Appeals Board (the "PAB")

11  because he was not on probation.  (Doc. #57, ¶45).  The PAB recommended that the HVFD

12  Board reverse Campbell's termination.  (Doc. #57, ¶45).  The HVFD Board upheld the

13  termination of Campbell.  (Doc. #57, ¶46).

14  **Plaintiff Lopez**

15        Plaintiff Lopez's interview/interrogation centered around the Union.  Defendants

16  Schrum and Lewis asked Plaintiff Lopez about the Union and what information Lopez might

17  have provided to the Union.  (Doc. #57, ¶23).  Plaintiffs allege that Lewis and Schrum told

18  Lopez: that the Union was not real; that the HVFD is not a member of the Union or the IAFF;

19  and that the Union was powerless to help Lopez in anyway.  (Doc. #57, ¶23).  Schrum told

20  Lopez that paying dues to an organization that gives nothing in return is like throwing money

21  down the drain.  (Doc. ##57 & 73, ¶23).

22        Lopez alleges that during the meeting he stated his concern about Scott threatening

23  to fire employees and interrogating employees about their affiliation with the Union and

24  about the substance of the Union meetings.  (Doc. #57, ¶23).  Lopez further alleges that he

25  expressed concern about departmental morale, staffing and safety issues, a hostile work

26  environment for Union employees, the overall management of the HVFD, and his own job

27  security.  (Doc. #57, ¶23).

28        Defendants contend that Lopez never spoke about adequate staffing during his

interview with Schrum.  (Doc. #73, ¶23).  Defendant Schrum also denies telling Plaintiff Lopez that the Union was not "real."  (Doc. #73, ¶25).

On January 9, 2007, in front of Defendant Schrum, Chief Eder told Plaintiff Lopez that if Lopez did not resign from the HVFD, Eder would fire him.  (Doc. #57, ¶47).  Chief Eder provided paperwork to Lopez that alleged Lopez had harassed a firefighter.  (Doc. #57, ¶47).  The complaint was made in November of 2006 and updated in December of 2006.  (Doc. #57, ¶47).  The paperwork also alleged that Lopez was "creating an environment of discord and disharmony within the [HVFD]."  (Doc. #57, ¶47).

Lopez alleges that the facts, complaints, and allegations against him had not been previously disclosed and that the information provided no substantive details.  (Doc. #57, ¶47).  Lopez requested to see any specific allegations against him, but Chief Eder allegedly refused that request.  (Doc. #57, ¶48).  Chief Eder believed that his letter to Lopez did an adequate job of documenting the charges against him.  (Doc. #73, ¶47).

Chief Eder offered Lopez what Plaintiffs characterize as a "buy out" or severance package, and what Defendants characterize as a "mutual nondisparagement agreement."  (Doc. #57, ¶49; Doc. #73, ¶47).  The buy out/nondisparagement agreement called for a waiver of liability of all claims against the HVFD and its officers, directors, employees, and agents.  (Doc. #57, ¶49).  Defendant Schrum told Plaintiff Lopez that any negative information regarding Lopez would be destroyed if he signed the waiver of liability.  (Doc. #57, ¶49).

Plaintiff Lopez informed Chief Eder on January 16, 2007, that he would not voluntarily retire.  (Doc. #57, ¶50).  Chief Eder immediately terminated Lopez.  (Doc. #57, ¶50).  The termination papers cited Lopez's failure to rebut the previously outlined charges against him, despite Chief Eder's refusal to provide Lopez with documentation regarding the allegations.  (Doc. #57, ¶50).

Plaintiff Lopez appealed his termination to the PAB.  (Doc. #57, ¶51).  Both the PAB and the HVFD Board denied his appeals.  (Doc. #57, ¶51).

The HVFD historically performed annual evaluations of all employees.  (Doc. #57,

1   ¶54).  Plaintiffs allege that in the fall of 2006, the HVFD lost all employees' performance

2   evaluations for 2005 and 2006.  (Doc. #57, ¶54).  Defendants allege that the HVFD

3   documents were stolen during the fall of 2006 by former HVFD firefighter Mac Nelson.

4   (Doc. #73, ¶54).  Defendants do not specifically allege which documents were stolen.

5       ## II.    LEGAL STANDARD

6           Summary judgment is appropriate when "the pleadings, depositions, answers to

7   interrogatories, and admissions on file, together with affidavits, if any, show that there is no

8   genuine issue as to any material fact and that the moving party is entitled to summary

9   judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, summary judgment is mandated,

10  "...against a party who fails to make a showing sufficient to establish the existence of an

11  element essential to that party's case, and on which that party will bear the burden of proof

12  at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

13          Initially, the movant bears the burden of pointing out to the Court the basis for the

14  motion and the elements of the causes of action upon which the non-movant will be unable

15  to establish a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the

16  non-movant to establish the existence of material fact.  *Id*.  The non-movant "must do more

17  than simply show that there is some metaphysical doubt as to the material facts" by

18  "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

19  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting

20  Fed. R. Civ. P. 56(e)).  A dispute about a fact is "genuine" if the evidence is such that a

21  reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,

22  Inc.*, 477 U.S. 242, 248 (1986).  The non-movant's bare assertions, standing alone, are

23  insufficient to create a material issue of fact and defeat a motion for summary judgment. Id.

24  at 247-48.  However, in the summary judgment context, the Court construes all disputed facts

25  in the light most favorable to the non-moving party.  *Ellison v. Robertson*, 357 F.3d 1072,

26  1075 (9th Cir. 2004).

27

28

1    III.    **CONSTITUTIONAL CLAIMS**

2        **A.    Free Speech**

3        Plaintiffs argue that Defendants fired them in retaliation for exercising their rights to

4    free speech.   To establish a prima facie case for First Amendment retaliation, public

5    employees, like Plaintiffs, must prove that: 1) they engaged in protected speech; 2) they

6    suffered an adverse employment action; and 3) their speech was a substantial or motiving

7    factor behind the adverse employment action. *Hudson v. Craven*, 403 F.3d 691, 695 (9th Cir.

8    2005).  The Court will first recite the general law regarding the three elements of a retaliation

9    claim, then will analyze the merits of each Plaintiff's particular claim.

10        **1. Protected Speech**

11        In analyzing whether a public employee engaged in protected speech, the Court

12    applies the balancing test set out in *Pickering v. Bd. of Educ. of Township High School Dist.*

13    *205, Will County*, 391 U.S. 563 (1968). *Id*. at 696.  The *Pickering* analysis involves a two-

14    part inquiry: 1) whether the speech that led to the adverse employment action relates to a

15    matter of "public concern" and 2) whether, under the balancing test, the employer can

16    demonstrate that its legitimate interests outweigh the public employee's First Amendment

17    rights.  *Id*.

18        The First Amendment protects the speech of a public employee if the speech addresses

19    "'a matter of legitimate public concern.'" *Coszalter v. City of Salem*, 320 F.3d, 973 (9th Cir.

20    2003)(quoting *Pickering*, 391 U.S. at 571).   Speech that concerns matters about which

21    information is needed or appropriate to help members of society make informed decisions

22    about the operation of their government merits the highest level of First Amendment

23    protection. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)(internal citations

24    omitted).  On the other hand, speech by public employees does not address matters of public

25    concern if the speech clearly deals with individual personnel disputes and grievances and that

26    the information would be irrelevant to the public's evaluation of the performance of the

27    government.  *Id*.  If employee speech does not touch on a matter of public concern,

28    government officials should have wide latitude to manage their offices, without intrusive

1  oversight by the courts. *Connick v. Myers*, 461 U.S. 138, 146-47 (1983).

2      The determination of whether speech addresses a matter of public concern is a

3  question of law, not fact. *Connick,* 461 U.S. at 148 n.7; *Hyland v. Wonder*, 972 F.2d 1129,

4  1134 (9th Cir. 1992). When deciding whether speech relates to an issue of public concern,

5  the Court considers the "content, form, and context" of the speech. *Coszalter*, 320 F.3d at

6  973-74 (internal citations omitted). If some part of the speech addresses an issue of public

7  concern, First Amendment protection applies, even though other aspects of the

8  communication do not qualify as a public concern. *Hyland*, 972 F.2d at 1137.

9      Speech does not lose First Amendment protection if the public employee chooses to

10  communicate privately with his employer rather than spread his views to the public. *Id*. at

11  1138-39 (quoting *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979));

12  *see also Connick*, 461 U.S. at 149 (finding that an item on a questionnaire circulated only to

13  colleagues still qualified as a matter of public concern). Nor does a speech's alleged

14  recklessness automatically deprive the speech of protection. *Johnson v. Multnomah County*,

15  *Oregon*, 48 F.3d 420, 424 (9th Cir. 1995)("[R]ecklessly false statements are not per se

16  unprotected by the First Amendment when they substantially relate to matters of public

17  concern. Instead, the recklessness of the employee and the falseness of the statements should

18  be considered in light of the public employer's showing of actual injury to its legitimate

19  interests, as part of the *Pickering* balancing test.").

20      The Ninth Circuit Court of Appeals previously has held that "an opinion about the

21  preparedness of a vital public-safety institution, such as a fire department, goes to the core

22  of what constitutes speech on matters of public concern." *Gilbrook v. City of Westminster*,

23  177 F.3d 839, 866 (9th Cir. 1999). It also has favorably cited a Second Circuit Court of

24  Appeals case finding that a report charging low morale, inadequate training, and discipline

25  of firefighters was a matter of public concern. *Hyland*, 972 F.2d at 1138 (citing *Janusaitis*

26  *v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 18 (2d Cir. 1979)).

27      A determination that an employee's speech touches a matter of public concern does

28  not end the constitutional inquiry. *Gilbrook*, 177 F.3d at 867; *Hyland*, 972 F.2d at 1139. The

1    public concern prong is a necessary, but not in itself sufficient, condition for constitutional

2    protection. *Gilbrook*, 177 F.3d at 867.  It merely brings the claim within the coverage of the

3    First Amendment, and thus "ensures that a court will test the reasons for restriction against

4    first amendment standards."  *Id*. (internal citations omitted).  An employer can prevail, even

5    if the speech touches a matter of concern, if the *Pickering* balancing test favors the

6    employer's legitimate administrative interests.  *Hudson*, 403 F.3d at 699.  The determination

7    of whom the *Pickering* balance favors is a question of law, not fact.  *Loya v. Desert Sands*

8    *Unified Sch. Dist.*, 721 F.2d 279, 281 (9th Cir. 1983).

9            The *Pickering* test entails striking a balance between the interests of the employee, as

10   a citizen, to comment on matters of public concern and the interest of the government, as an

11   employer, in promoting the efficiency of the public services it performs.  *Gilbrook*, 177 F.3d

12   at 867 (quoting *Pickering*, 391 U.S. at 568).  The following are some factors a court may

13   consider in striking that balance: whether the speech 1) impairs discipline or control by

14   superiors; 2) disrupts co-worker relations; 3) erodes a close working relationship premised

15   on personal loyalty or confidentiality; 4)interferes with the employee's performance of his

16   or her duties; or 5) obstructs the routine operation of the government office.  *Hyland*, 972

17   F.2d at 1139.  The nature of the government employer's burden to show disruption and

18   inefficiencies varies depending on the content of the speech.  *Id*.  "The more tightly the First

19   Amendment embraces the speech the more vigorous a showing of disruption must be made."

20   *Id*.

21                        **2. Adverse Employment Action**

22           To satisfy the second element of a prima facie case for First Amendment retaliation,

23   Plaintiffs must demonstrate they suffered an adverse employment action.  *Hudson*, 403 F.3d

24   at 695.  Chief Eder terminated all six of the Plaintiffs.  Defendants concede that all the

25   Plaintiffs suffered an adverse employment action.  (Doc. #72, p. 5).

26            **3. Substantial or Motivating Factor for the Adverse Employment Action**

27           The third element of a prima facie case for First Amendment retaliation involves

28   causation.  Plaintiffs must demonstrate that their speech was a substantial or motiving factor

1   behind their terminations.  *Id.*  The Ninth Circuit Court of Appeals has listed three ways that

2   a plaintiff can demonstrate that retaliation was a substantial or motivating factor behind the

3   employer's adverse employment action: 1) the plaintiff can introduce evidence of the

4   proximity in time between the protected action and the adverse employment action; 2) the

5   plaintiff can demonstrate that his employer expressed opposition to his speech, either to him

6   or to others; and 3) the plaintiff can introduce evidence that his employer's stated reasons for

7   the adverse employment action were false and pre-textual.  *Coszalter*, 320 F.3d at 977.

8         Once a plaintiff has met the prima facie burden on retaliation, the burden shifts to the

9   employer to demonstrate by a preponderance of the evidence that it would have taken the

10   same employment action even in the absence of protected conduct.  *Mt. Healthy City Sch.*

11   *Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  A defendant can prevail, even if  the

12   employee engaged in protected conduct, if the employer can demonstrate it would have taken

13   the same employment action regardless of the protected conduct.  *Hudson*, 403 F.3d at 695.

14         **B.**    **Free Association**

15         Plaintiffs argue that they have separate and independent causes of action for violations

16   of their rights to free speech and association.  Defendants argue that Plaintiffs have hybrid

17   claims, which therefore should be analyzed under the *Pickering* test, including the

18   requirement that the protected conduct touch a matter of public concern.

19         In *Hudson v. Craven*, the Ninth Circuit Court of Appeals first analyzed how to treat

20   a First Amendment retaliation claim that was predominantly a right of free association claim.

21   403 F.3d at 695-96.  In *Hudson*, the court found that although the associational aspects of the

22   plaintiff's claim predominated, her speech rights were inextricable from the claim.  *Id.* at 696.

23   Because the claim implicated the plaintiff's core speech rights, the court characterized her

24   claim as a hybrid speech/association claim.  *Id.*   The court then applied the *Pickering*

25   balancing test to the claim, even though it recognized that applying the "public concern"

26   component to an associational claim could pose some difficulties.  *Id.* at 697-98.

27         Plaintiffs allege that Defendants fired them because they actively participated in the

28   Union.  They argue that the "public concern" component should not apply to their purely

1  associational claims.  Defendants argue that Plaintiffs' claims are hybrid because the
2  associational claims implicate their speech claims.

3      The Court agrees with Defendants.  Plaintiffs' accusations regarding Defendants'
4  alleged anti-Union animus relate to what was said at Union meetings, what information
5  firefighters had provided to the Union, and whether or not Plaintiffs' should speak out about
6  Union concerns regarding Chief Eder.  Although the associational aspects may predominate
7  some of the Plaintiffs' claims – while other Plaintiffs' claims are primarily free speech
8  claims, the Court finds that the speech and associational rights at issue in the case "are so
9  intertwined that [the Court sees] no reason to distinguish this hybrid circumstance from a
10 case involving only speech rights." *Hudson*, 403 F.3d at 698.  The Court therefore will apply
11 the *Pickering* analysis to all of Plaintiffs' claims.  *Id.*

12      **C.    The Claims of the Individual Plaintiffs**
13           **1. Plaintiffs Dooley and Schnabel**

14      Plaintiffs Dooley and Schnabel were responsible for circulating and compiling the list
15 of concerns that spurred the September 5, 2006 HVFD meeting.  The list of concerns
16 includes comments about staffing inadequacy, inferior compensation for firefighters, misuse
17 of department funds, misuse of department property, lack of properly trained people, and lack
18 of equipment.  (Ex. 1 to Doc. #57).

19      The Ninth Circuit Court of Appeals has held that a fire department's ability to respond
20 effectively to an emergency is of utmost public concern.  *Gilbrook*, 177 F.3d at 866.  "[A]n
21 opinion about the preparedness of a vital public-safety institution, such as a fire department,
22 goes to the core of what constitutes speech on matters of public concern."  *Id.*  The concerns
23 listed by Plaintiffs Dooley and Schnabel potentially impact HVFD's ability to respond to
24 emergency situations.  Likewise, courts have held that the ability to attract qualified public
25 safety officers with sufficient compensation is of great public concern. *McKinley v. City of*
26 *Eloy*, 705 F.2d at 1114.  The list also implicates misuse of government funds and property,
27 which courts have long held is a matter of inherent public concern.  *See, e.g.*, *Johnson*, 48
28 F.3d at 425.

1    Defendants nonetheless argue that the list does not address matters of public concern

2    because it includes personal grievances, was not given to Chief Eder or to members of the

3    public, and contained inflammatory and inaccurate statements.  First, the inclusion on the list

4    of personal grievances is not relevant.  *Posey v. Lake Pend Oreille School Dist. No. 84*, 546

5    F.3d 1121, 1130 n.5 (9th Cir. 2008)(quoting *Connick*, 461 U.S. at 149).  Statements that

6    present mixed questions of private and public concern fall within the First Amendment's

7    protection.  *Id.*

8    Second, Plaintiffs have testified they did not know what they were going to do with

9    the final list and did not have an opportunity to make that decision because Chief Eder

10   intercepted a copy.  They did spread the list around the department in an effort to collect

11   more concerns.  Further, as previously stated, speech does not lose First Amendment

12   protection if the public employee chooses not to spread his views to the public.  *Hyland*, 972

13   F.2d at 1138-39.  Plaintiffs Dooley and Schnabel's failure to share the list of concerns

14   outside of the HVFD before Chief Eder got a copy does not deprive their speech of

15   protection.

16   Finally, the inflammatory nature of some of the statements and their alleged

17   inaccuracy does not deprive them of protection.  The Ninth Circuit Court of Appeals has

18   specifically stated that some inaccuracy in the content of the speech must be tolerated.

19   *Hyland*, 972 F.2d at 1137 (citing *Pickering*, 391 U.S. at 570-72).

20   The Court holds that the email list circulated and compiled by Plaintiffs Dooley and

21   Schnabel clearly touches on matters of public concern.  Because the Court finds the list

22   addresses public matters, it must engage in the *Pickering* balance.  The Court must determine

23   whether the HVFD's legitimate administrative interests outweigh Plaintiffs Dooley and

24   Schnabel's First Amendment rights.

25   Defendants argue that a fire department especially depends on discipline and *esprit*

26   *de corp* to properly function, and that the Plaintiffs' actions impaired discipline and control

27   by their superiors.  *Gilbrook*, 177 F.3d at 868.  Defendants also argue that the email list

28   actually hindered the operation of the HVFD because Chief Eder had to call a department-

1  wide meeting to address the issues.  Finally, Defendants argue that morale at the HVFD was
2  low, and the efforts of those who wanted Chief Eder terminated contributed to that low
3  morale.

4       The Court does not agree with Defendants that Plaintiffs' circulation of the list
5  actually hindered and disrupted the HVFD's operations.  Chief Eder chose to call a
6  departmental meeting after receiving a copy of the list; Plaintiffs did not call a meeting.
7  Further, Defendants have not offered any evidence that the September 5 meeting caused any
8  problems.  Plaintiffs Dooley and Schnabel were not high-level policy makers.  Defendants
9  have offered no evidence that their discussion of problems with the HVFD hindered the
10 performance of their jobs, nor that the circulation of the list impacted any other fireman's on-
11 job performance.  Although Plaintiffs Dooley and Schnabel did not share the list with the
12 media, they did circulate it throughout the department in an effort to encourage discussion
13 and expand their list of concerns.

14      The Court agrees with Defendants that morale at the HVFD was low.  But Plaintiffs
15 Dooley and Schnabel's actions could not have had more than a "marginal impact" on the
16 firefighters' already low morale.  *See id.* at 869.  And while the Court also agrees with
17 Defendants that *esprit do corp* is important for the functioning of a fire department, given the
18 magnitude of the speech rights at issue, Defendants needed to more definitively demonstrate
19 that the list disrupted or really threatened to disrupt the HVFD.  *See id.* at 867 ("Here, as
20 noted, []'s expression lies at the core of speech on matters of public concern.  Thus,
21 defendants' showing of disruption, real or potential, must be correspondingly greater.")

22      The Court finds that the *Pickering* balance favors Plaintiffs Dooley and Schnabel.
23 Plaintiffs Dooley and Schnabel therefore engaged in protected speech. The Court has already
24 held that Plaintiffs suffered an adverse employment action.  That leaves the third factor of
25 Plaintiffs' prima facie case – causation.

26      Plaintiffs Dooley and Schnabel have presented sufficient evidence to raise an issue
27 of fact as to whether their circulation and discussion of the list of concerns played a
28 substantial or motivating role in their terminations.  Chief Eder received a copy of the list on

1   August 31, 2006.  He called a meeting for September 5, 2006 to discuss the list.  Chief Eder

2   ignored both Dooley and Schnabel's attempts to speak to the group at that meeting.  Chief

3   Eder fired Plaintiff Dooley on September 12, 2006 – seven days after the meeting.  He fired

4   Plaintiff Schnabel on September 15, 2006 – ten days after the meeting.  Chief Eder also

5   expressed disapproval of their opinions.

6        Given all of the above, Plaintiffs Dooley and Schnabel have met their prima facie

7   burden on causation against Chief Eder.  Although they have created an issue of fact

8   regarding his reason for terminating them, the Court does not find that Plaintiffs have

9   demonstrated as a matter of law that their activities served as a substantial or motivating

10  factor behind their terminations.[1]  The fact finder should make that determination.  Likewise,

11  the Court cannot say as a matter of law that Chief Eder would not have fired Dooley and

12  Schnabel regardless of their protected activity.

13       The Court therefore cannot grant Plaintiff Dooley and Schnabel's motion for partial

14  summary judgment on their free speech and association claims against Chief Eder.  For the

15  same reasons, the Court cannot grant summary judgment to Defendant Eder on Plaintiff

16  Dooley and Schnabel's First Amendment claims, unless the Court subsequently finds he has

17  immunity.

18       The Court will grant Defendants' motion, however, with regard to Dooley and

19  Schnabel's First Amendment claims against the individual members of the HVFD Board –

20  Defendants Lewis, Bodenhamer, Bunge, Schrum, and Seieroe.  Dooley and Schnabel have

21  not demonstrated that any members of the Board played a substantial individual role in their

22  terminations.

23       The Court will address Dooley and Schnabel's claims against the HVFD in a separate

24  portion of this Order.

25

26

27       [1]"Whether an adverse employment action is intended to be retaliatory is a question of
    fact that must be decided in the light of the timing and the surrounding circumstances."
28  *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).

1

## 2. Plaintiff Nyberg

2      Although Captain Scott stated that he believed all the Plaintiffs played a role in

3   circulating and compiling the list of concerns, Plaintiffs themselves have not specified that

4   either Nyberg, Carlson, Campbell, or Lopez participated.  Disregarding Nyberg's interactions

5   with non-Defendant Scott,[2] Plaintiff Nyberg's allegedly protected conduct occurred in the

6   course of his interview with Defendants Schrum and Lewis.

7      During his interview, Plaintiff Nyberg discussed the high turnover rate at the HVFD,

8   the fact that firefighters were constantly on probation, and the incident with Captain Scott.

9   The high turnover rate at the HVFD arguably touches on a matter of public concern.  The

10  public has an interest in fire departments attracting and retaining qualified firefighters.

11     Although turnover is somewhat a topic of public interest, it was discussed only after

12  questioning in a private interview.  The context and form of the speech slightly cut against

13  a finding of public concern. However, given the content, context, and form as revealed by

14  the whole record, the Court finds that his speech did address a matter of public concern.

15  Defendants allegedly conducted these interviews to investigate the claims of wrongdoing

16  against Chief Eder.  Some of the claims addressed the HVFD's ability to function at the

17  highest level.  And, as the Ninth Circuit Court of Appeals has stated, "firefighters . . . are

18  members of the community who are most likely to be informed and have definite opinions

19  about the sufficiency of firefighting services."  *Gilbrook*, 177 F.3d at 867.

20     The Court must next determine which party the *Pickering* balance favors.  Because

21  Plaintiff Nyberg's speech is not very tightly "embraced" by the First Amendment,

22  Defendants do not need a very strong showing of workplace disruption.  *Id*.  But Defendants

23  have not shown that Plaintiff Nyberg's conduct caused disruption, impaired discipline, or

24  interfered with Nyberg's duties.  Further, Plaintiff Nyberg is not a high-level, policy maker.

25  On the other hand, Nyberg directed his statements to Defendants Schrum and Lewis in the

26

27      [2]Plaintiffs make several allegations regarding the actions of Captain Scott.  But

28  because Captain Scott is not a defendant in this case, those allegations are largely irrelevant.

course of a private interview.  Courts have acknowledged that a narrow, limited focus to a narrow audience weights against a finding of public concern.  *Id*. at 868.  Nonetheless, the Court finds, after weighing the various factors, that the *Pickering* balance slightly favors Plaintiff Nyberg and a finding of protected speech/conduct.

Like Plaintiffs Dooley and Schnabel, Chief Eder terminated Plaintiff Nyberg.  Nyberg undisputedly suffered an adverse employment action.  Also like Dooley and Schnabel, the timing of Nyberg's termination and other statements made to him raise an issue of fact regarding the motive for his termination.

Unlike Plaintiffs Dooley and Schnabel, two of the HVFD Board members played individual roles in his termination.  Section 1983 liability attaches to anyone who "'causes' any citizen to be subjected to a constitutional deprivation."  *Id*. at 854 (internal citations omitted).  The requisite causal connection for a retaliation claim can be established if a defendant sets into motion a series of acts, which the actor knows or reasonably should know would cause others to retaliate.  *Id*.

Defendants Lewis and Schrum arguably should have known that their interview of Nyberg might lead to his termination.  Under Plaintiffs' version of the disputed facts, Defendants Lewis and Schrum used these "interrogations" as a method for ferreting out firefighters who were not loyal to the Chief.  Chief Eder then received copies of the notes of these interviews. (Doc. #67, ¶301).  Soon after the interview, Chief Eder terminated Plaintiff Nyberg.  Defendants Lewis and Schrum are therefore in the line of causation for Nyberg's claims.  The remaining HVFD Board member Defendants did not take any individual actions against Nyberg that precipitated his termination.[3]

In summary, factual issues remain regarding: 1) whether retaliation was a substantial or motivating factor for Nyberg's termination and 2) whether Chief Eder would have terminated Nyberg regardless of Nyberg's speech/actions.  The Court therefore cannot grant

---

[3]Plaintiffs' allegations that all of the HVFD Board members ratified certain actions of Chief Eder after the fact does not place the remaining Board members in the chain of causation.

1    Plaintiffs' partial summary judgment motion on Nyberg's claims and cannot grant

2    Defendants' motion with regard to Defendants Eder, Lewis, and Schrum, unless they have

3    qualified immunity.  The Court will grant summary judgment to Defendants Bodenhamer,

4    Bunge, and Seieroe on Nyberg's constitutional claims.   The Court will address the

5    constitutional claims against the HVFD in a separate portion of this Order.

6                          **3. Plaintiff Carlson**

7              Plaintiff Carlson also discussed some of his and the Union's concerns regarding

8    staffing and manning issues during his session with Defendants Lewis and Schrum.  The

9    Court's analysis of Plaintiff Nyberg's constitutional claims applies to Plaintiff Carlson as

10   well. The Court reaches the same result with regard to Carlson.  Carlson did speak on a

11   matter of public concern at the interview and, for the reasons outlined above, the *Pickering*

12   analysis slightly favors him as well.

13             The Court therefore finds that Plaintiff Carlson engaged in protected speech/conduct.

14   He also has raised an issue of fact regarding the possible retaliatory motive for his discharge.

15    Although he has raised a factual issue, the Court cannot say as a matter of law: 1) that his

16   actions/speech were a substantial or motivating factor for his termination or 2) that Chief

17   Eder would have terminated Carlson regardless of any protected conduct.  For those reasons,

18   the Court will deny Carlson's motion for partial summary judgment.  The Court will also

19   deny Defendants' motion with regard to Defendants Eder, Lewis, and Schrum, unless they

20   have qualified immunity.   The Court will grant summary judgment to Defendants

21   Bodenhamer, Bunge, and Seieroe on Carlson's constitutional claims. The Court will address

22   the constitutional claims against the HVFD later in this Order.

23                          **4. Plaintiff Campbell**

24             Plaintiff Campbell appears to have had a more in depth conversation with Defendants

25   Lewis and Schrum regarding his concerns with the HVFD.  They discussed Chief Eder's

26   management style and abusive language, proper manning and staff levels, high turnover, poor

27   Departmental operational communications, automatic aid agreements with other Fire

28   Departments, and the actual list of concerns circulated and compiled by Dooley and

Schnabel.  During the interview, Defendants also made several pointed comments about the Union.

Plaintiff Campbell's speech addressed numerous matters of public concern, and he specifically discussed his Union membership.  The content of his speech was more geared toward public matters than the speech of Plaintiffs Nyberg and Carlson.[4]  Because his speech addressed more and wider topics of public concern, the *Pickering* balance tips more heavily in his favor.  The Court finds he engaged in protected speech/conduct.

The Court further finds that Plaintiff Campbell has created an issue of fact regarding whether his protected conduct substantially motivated Chier Eder to fire him.  Both the timing of his termination and the other surrounding circumstances raise the possibility that retaliation was a motivating factor in Chief Eder's decision to terminate Campbell.  In turn, Defendants have created an issue of fact regarding whether Chief Eder would have terminated Campbell even in the absence of protected conduct.[5]

Consequently, the Court will deny Campbell's motion for partial summary judgment.  The Court will also deny Defendants' motion with regard to Defendants Eder, Lewis, and Schrum, unless they have qualified immunity.  The Court will grant summary judgment to Defendants Bodenhamer, Bunge, and Seieroe on Campbell's constitutional claims.  The Court will address separately the constitutional claims against the HVFD.

### 5.    Plaintiff Lopez

Plaintiff Lopez's session with Defendants Lewis and Schrum involved a lot of discussion of the Union, what was said at Union meetings, and Lopez's personal apprehension about his job security.  Plaintiff Lopez alleges he also talked about department morale, staffing and safety issues, and the overall management of the HVFD.  Defendants

---

[4]"Content is the greatest single factor in the *Connick* inquiry." *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 424 (9th Cir. 1995)(internal quotations omitted).

[5]Defendants Lewis and Schrum played the same roles in Campbell's termination as they did in Nyberg, Carlson, and Lopez's terminations.

allege that Lopez never discussed adequate staffing. For purposes of Plaintiffs' motion, the Court must assume that Lopez did not discuss manning and safety issues. For the purposes of Defendants' motion, the Court must assume that Lopez did bring up those topics.

The Court has stated that the adequacy of manning and staffing at a fire department would interest the general public, and that fire fighters are in the best position to address those issues. Although Plaintiff Lopez discussed a lot of merely personal issues, his presumed discussion of manning and staffing levels and department morale bring his speech/conduct within the realm of the First Amendment. Like Plaintiffs Nyberg and Carlson, however, because the content of his speech did not heavily involve topics of public interest, and given the context and form of his speech, the *Pickering* balance only slightly favors Plaintiff Lopez.

Plaintiff Lopez has met his prima face burden of demonstrating causation against Defendants Eder, Lewis, and Schrum. He has created an issue of fact regarding the retaliatory motives of those Defendants. Likewise, Defendants have raised an issue of fact regarding whether Chief Eder would have terminated Plaintiff Lopez regardless of his protected activity.

The Court cannot grant partial summary judgment to Plaintiff Lopze on his constitutional claims for two reasons. First, because if Lopez did not discuss the adequacy of staffing and manning with Defendants Lewis and Schrum, the Court would likely find that Plaintiff Lopez did not meet the "public concern" requirement. Second, issues of fact remain regarding the reason for Plaintiff Lopez's termination.

For the reasons stated elsewhere in this opinion, the Court denies Defendants' motion with regard to Defendants Eder, Lewis, and Schrum, unless they have qualified immunity, and defers discussion of the HVFD's liability. The Court will grant summary judgment to Defendants Bodenhamer, Bunge, and Seieroe on Lopez's constitutional claims.

**D.    Qualified Immunity**

The Court must determine whether Defendants Eder, Lewis, and Schrum have qualified immunity from Plaintiffs' §1983 claims against them. The defense of qualified

immunity protects government officials who performed discretionary functions from liability for civil damages in some situations. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). "Government officials are entitled to qualified immunity only insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Coszalter*, 320 F.3d at 979 (internal quotations omitted). Thus, even if a constitutional violation occurred, an official should receive immunity if the right asserted by the plaintiff was not "clearly established." *Romero*, 931 F.2d at 627. The Court determines as a matter of law whether a defendant is entitled to qualified immunity. *Id*. at 628.

To determine whether qualified immunity attaches in cases involving protected speech by public employees, the Court asks whether the outcome of the *Pickering* balance so clearly favors the plaintiff that it would have been patently unreasonable for the defendants to think that the First Amendment did not protect the plaintiff's speech. *Gilbrook*, 177 F.3d at 867. If the *Pickering* balance clearly favors a particular Plaintiff in this case, then Defendants Eder, Lewis, and Schrum are not entitled to qualified immunity for the claims of that Plaintiff. If the balance does not clearly favor a Plaintiff, then they do have qualified immunity.

The Court has found previously in this Order that the *Pickering* balance only slightly favors Plaintiffs Nyberg, Carlson, and Lopez. Because the *Pickering* balance test does not clearly favor those Plaintiffs, Defendants Eder, Lewis, and Schrum are entitled to qualified immunity from their constitutional claims. The Court therefore grants summary judgment to Defendants Eder, Lewis, and Schrum on Plaintiffs Nyberg, Carlson, and Lopez's First Amendment claims.

The qualified immunity decision is a closer call on Plaintiff Campbell's claims. Because the content of his speech more deeply addressed matters of public concern, the *Pickering* balance tips more in his favor than it did for Nyberg, Carlson, and Lopez. Nonetheless, given context and form of the speech/conduct, the Court does not find that the balance "so *clearly*" favors Campbell that it would have been patently unreasonable for

Defendants Eder, Lewis, and Schrum to conclude that the First Amendment did not protect Campbell's speech/conduct.   *See Gilbrook*, 177 F.3d at 867.   Thus, the Court grants immunity and summary judgment to Defendants Eder, Lewis, and Schrum on Plaintiff Campbell's First Amendment claims.

The Court reaches a different result on Plaintiffs Dooley and Schnabel's claims. Plaintiffs Dooley and Schnabel contacted firefighters throughout the HVFD to solicit any concerns the firefighters might have about the department.   They began compiling a list of these concerns.   The concerns included matters of utmost public interest.   They attempted to speak about these concerns at the departmental meeting, but were ignored.   As discussed previously in this Order, Defendants have not shown that Dooley and Schnabel's speech caused an actual or a real threat of disruption.

Assuming for the purposes of this motion that Chief Eder fired Plaintiffs Dooley and Schnabel in retaliation for their speech and would not have terminated them otherwise, it was patently unreasonable for him to conclude that the First Amendment did not protect their speech.   The *Gilbrook* opinion, among others, should have put Chief Eder on notice that the list of concerns generated by Schnabel and Dooley were topics of public concern entitled to protection.   Because the *Pickering* balance clearly favors Plaintiffs Dooley and Schnabel, the Court will deny qualified immunity and summary judgment to Chief Eder on their First Amendment claims.

### E.     Municipal Liability

Defendants argue that the HVFD is entitled to summary judgment on Plaintiffs' constitutional claims.   Defendants correctly point out that the HVFD cannot be held vicariously liable under §1983 for the actions of the individual Defendants based solely on the employer/employee relationship.   *See, e.g., McKinley*, 705 F.2d at 1116.   But municipalities are liable when "action pursuant to official policy of some nature causes a constitutional tort."   *Id*.

The HVFD's liability may be premised on any of the following theories: 1) that the individual Defendants acted pursuant to an expressly adopted official policy, 2) that the

1   individual Defendants acted pursuant to a long standing practice or custom, 3) that a

2   Defendant was acting as a final policy maker, *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir.

3   2004), or 4) that a Defendant with final policy-making authority ratified a subordinate's

4   unconstitutional decision or action and the basis for it, *Gillette v. Delmore*, 979 F.2d 1342,

5   1346-47 (9th Cir. 1992).

6         Thus, the HVFD could be liable for the individual Defendants' actions if either Chief

7   Eder or the HVFD Board is a final policy maker. Chief Eder terminated all the Plaintiffs. If

8   Chief Eder is the final policy maker on personnel matters, then the HVFD could be held

9   responsible for those terminations. If the HVFD Board is the final policy maker, then the

10  HVFD could be held liable if the Board ratified the terminations.

11        To determine if a defendant is a final policy maker, the Court first looks to state law.

12  *Lytle*, 382 F.3d at 982. But a defendant may act as a *de facto* policymaker under §1983

13  without explicit authority under a charter or other state law. *Id*. The Court may look to the

14  way a local government entity operates in practice. *Id*. at 983.

15        When analyzing whether a person has final policymaking authority, the Court asks

16  whether that person has authority in a particular area or on a particular issue. *Id*. For Chief

17  Eder to be a final policymaker, he "must be in a position of authority such that a final

18  decision by [him] may appropriately be attributed to" the HVFD. Because Plaintiffs'

19  terminations are the adverse employment actions at issue here, the Court must determine

20  whether Chief Eder had the ultimate authority to terminate firefighters.

21        Neither party has provided the Court with a state or fire district law or ordinance

22  dictating who has final authority for employee terminations. Regardless of any applicable

23  law or ordinance, however; it appears that in practice, Chief Eder exercises that authority.

24  As stated by Defendants in their Separate Statement of Facts: "the only individual who can

25  fire HVFD firefighters is Chief Eder" (doc. #67, ¶179) and "Chief Eder manages all the

26  employees" (doc. #67, ¶326). The Court therefore finds that Chief Eder is the final

27  policymaker for the HVFD when it comes to terminating firefighters. Because he is the final

28  policymaker, the HVFD could be held liable for the terminations of Plaintiffs.

1    The HVFD does not escape from liability for the claims of Plaintiffs Nyberg, Carlson,

2    Campbell, and Lopez just because Chief Eder has immunity from those claims.  Despite

3    Defendants' apparent argument to the contrary, municipalities do not enjoy qualified

4    immunity from §1983 claims.  *Owen v. City of Independence, Mo.*, 445 U.S. 622, 638

5    (1980)("But there is no tradition of immunity for municipal corporations, and neither history

6    nor policy supports a construction of §1983 that would justify [municipal immunity].").  If

7    the jury ultimately finds that Chief Eder impermissibly terminated Plaintiffs Nyberg, Carlson,

8    Campbell, and Lopez in retaliation for exercising their First Amendment rights, then the

9    HVFD will be liable for those constitutional violations.  Consequently, the Court denies

10   summary judgment to the HVFD on Plaintiffs' First Amendment claims.

11   **IV.    STATE STATUTORY CLAIMS**

12   **A.    ARS §23-1411 - Counts III & IV**

13   Section 23-1411(A) of the Arizona Revised statutes provides:

14   > Public safety employees serving any city, town, county or fire
district in this state have the right to join employee associations
15   > which comply with the laws of this state and have freedom to
present proposals and testimony to the governing body of any
16   > city, town, county or fire district and their representatives.  A
person shall not be discharged, disciplined or discriminated
17   > against because of the exercise of these rights.

18   Defendants argue they are entitled to summary judgment on Counts III & IV because

19   they did not violate A.R.S. §23-1411(A).  In support of that argument, Defendants state that

20   Plaintiffs' terminations clearly did not violate any of their constitutional rights.  However,

21   the Court has rejected this contention.

22   Defendants also argue that they are entitled to a "qualified privilege" with respect to

23   the terminations of Plaintiffs.  The Court does not know for sure what Plaintiffs mean by this

24   argument.  The Court has granted qualified immunity to Defendants Eder, Lewis, and

25   Schrum on the §1983 claims of certain Plaintiffs.  It does not follow that those Defendants

26   have immunity from Plaintiffs' state law claims – constitutional or statutory.

27   Defendants have one throw-away sentence in their motion for summary judgment that

28   states, "Qualified immunity, under Arizona law, also extends to Plaintiff's [sic] State law

1  claims."  (Doc. # 66, p.4).  Defendants cite two cases for that proposition, but provide no

2  further analysis.  Nor do the cited cases make the necessary argument for the Defendants.

3  To the extent Defendants intended that one sentence to make a state law immunity argument,

4  they failed.  The Court finds that sentence insufficient to raise a proper state law immunity

5  argument and deems Defendants to have waived any such argument for the purposes of the

6  Motion for Summary Judgment.

7          Finally, Defendants argue that the evidence establishes the Plaintiffs were terminated

8  for valid reasons, unrelated to their claims, and the Court therefore should grant them

9  summary judgment on the §23-1411 claims.  The Court has held that factual issues remain

10  regarding the reasons for Plaintiffs' terminations, so this final argument does not prevail.

11         The Court finds that Defendants have not met their burden of demonstrating they are

12  entitled to judgment as a matter of law on Counts III & IV.  The Court therefore denies

13  summary judgment on those Counts.

14  **B.      ARS §23-1501(3)(c) Count V**

15         Plaintiff Dooley has alleged in Count V that Defendants violated section 23-

16  1501(3)(c) of the Arizona Revised Statutes.  That section reads, in pertinent part:

17                  3. An employee has a claim against an employer for termination
                    of an employment only if one or more of the following

18                  circumstances have occurred:
                    . . .

19                  (c) The employer has terminated the employment relationship of
                    an employee in retaliation for any of the following:

20                  . . .
                    (ii) The disclosure by the employee in a reasonable manner that

21                  the employee has information or a reasonable belief that the
                    employer, or an employee of the employer, has violated, is

22                  violating or will violate the Constitution of Arizona or the
                    statutes of this state to either the employer or a representative of

23                  the employer who the employee reasonably believes is in a
                    managerial or supervisory position and has the authority to

24                  investigate the information provided by the employee and to
                    take action to prevent further violations of the Constitution of

25                  Arizona or statutes of this state or an employee of a public body
                    or political subdivision of this state or any agency of a public

26                  body or political subdivision.

27  A.R.S. §1501(3)(c)(ii).

28         Defendants argue for summary judgment on this Count because Plaintiff Dooley did

not "disclose . . . in a reasonable manner" his concerns to Chief Eder or another supervisor. Rather, Captain Scott received a copy of the email and turned the list over to Chief Eder without consulting Dooley.  (Doc. #66, pp. 16-17).  Plaintiffs counter that this argument is "absurd" because Dooley was compiling the list and gathering input from other employees before disclosing the information, and Chief Eder just preemptively called a meeting after receiving the list from Captain Scott.  (Doc. #70, p. 15).  Neither party cites a case in support of their arguments.

Plaintiff Dooley may have intended to eventually disclose the list of concerns to Chief Eder.  The fact remains, however, that he did not.  The statute provides a cause of action for employees who disclose information in a reasonable manner.  Plaintiff Dooley cannot maintain a claim under the statute because he has not alleged that he disclosed the concerns to Chief Eder or another person in a position of power over him in a reasonable manner.  The Court therefore grants summary judgment to Defendants on Count V.

## V.    Conclusion

The Court will deny Plaintiffs' Motion for Partial Summary Judgment on their First Amendment claims because factual questions remain regarding the reasons for their terminations.

The Court will grant Defendants' Motion for Summary Judgment in some respects, and deny it in other respects.  With regard to Plaintiffs Dooley and Schnabel's First Amendment claims (Counts I & II): the Court grants the motion for summary judgment motion as against Defendants Lewis, Bodenhamer, Bunge, Schrum, and Seieroe., and denies it as against Chief Eder and the HVFD.  With regard to Plaintiffs Nyberg, Carlson, Campbell, and Lopez's First Amendment claims (Counts I & II): the Court grants summary judgment to Defendants Bodenhamer, Bunge, and Seieroe for failure to show causation and to Defendants Eder, Lewis, and Schrum on qualified immunity grounds; the Court denies summary judgment to the HVFD.

The Court denies summary judgment to all Defendants on Counts III & IV.

The Court grants summary judgment to all Defendants on Count V.

1    Accordingly,

2    IT IS ORDERED DENYING Plaintiffs' Motion for Partial Summary Judgment (Doc.

3    #64).

4    IT IS FURTHER ORDERED DENYING in part and GRANTING in part in

5    accordance with this Order Defendants' Motion for Summary Judgment (Doc. #66).

6    DATED this 9th day of February, 2009.

7

8

9                                    James A. Teilborg
                                     United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28